IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on May 7, 2019

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| SUNARKO KUNTJORO, | ) | VIOLATIONS: |
| | ) | |
| PT MS AERO SUPPORT, | ) | (Conspiracy) |
| | ) | 18 U.S.C. §371 |
| PT ANTASENA KREASI,  and | ) | |
| | ) | (Violation of the International |
| PT KANDIYASA ENERGI UTAMA | ) | Emergency Economic Powers Act) |
| | ) | 50 U.S.C. § 1705 |
| Defendants. | ) | |
| | ) | (Iranian Transactions and Sanctions |
| | ) | Regulations) |
| | ) | 31 C.F.R. Part 560 |
| | ) | |
| | ) | (Global Terrorism Sanctions |
| | ) | Regulations) |
| | ) | 31 C.F.R. Part 594 |
| | ) | |
| | ) | (Export Administration Regulations) |
| | ) | 15 C.F.R. Parts 730-774 |
| | ) | |
| | ) | (International Money Laundering) |
| | ) | 18 U.S.C. § 1956 |
| | ) | |
| | ) | (False Statements) |
| | ) | 18 U.S.C. §1001(a)(2) |
| | ) | |
| | ) | (Aiding and Abetting and Causing an |
| | ) | Act to be done) |
| | ) | 18 U.S.C. § 2 |
| | ) | |
| | ) | (Forfeiture) |
| | ) | 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), |
| | ) | 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c) |

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE-CONSPIRACY

At all times material to this Indictment:

### Introduction

1.      **Sunarko Kuntjoro ("KUNTJORO")** was an Indonesian citizen, who is the majority owner and President Director of **PT MS Aero Support** ("PTMS"), an Indonesian company based in Jakarta, Indonesia.   Another shareholder and Director of PTMS is Person C, who is related to KUNTJORO.

2.      **PT Kandiyasa Energi Utama** ("PTKEU") was an Indonesian company based in Jakarta, Indonesia. The Technical Director of PTKEU is Person D, who is related to KUNTJORO.

3.      **PT Antasena Kreasi** ("PTAK"), was an Indonesian company based in Jakarta, Indonesia. PTAK is controlled by KUNTJORO and Person D.

4.      **Mustafa Oveici** was an Iranian citizen, who is an executive for **Mahan Air** ("**Mahan**"), an Iranian airline company based in Tehran, Iran.

5.      Conspirator A was a person living and working in the United States who was the owner of Conspirator B, a company incorporated and operating in the United States.

### The International Emergency Economic Powers Act and the Iranian Transaction and Sanctions Regulations

6.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.   Pursuant to this authority, the President and the Executive

Branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or of U.S.-origin goods.

7.      On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."   Executive Order No. 12957, as expanded and continued by Executive Orders Nos. 12959 and 13059 (collectively, "Executive Orders"), were in effect at all times relevant to this Indictment.

8.      The Executive Orders imposed economic sanctions, including a trade embargo, on Iran.   The Executive Orders prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a U.S. person.   The Executive Orders also prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

9.      The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.   Pursuant to this authority, the Secretary of the Treasury, promulgated the Iranian Transactions and Sanctions Regulations ("ITSR"), implementing the sanctions imposed by the Executive Orders.[1]

10.      The ITSR generally prohibit any person from exporting or causing to be exported

---

[1]On or about October 22, 2012, the Department of the Treasury revised and renamed the Iranian Transactions Regulations ("ITR") as the "Iranian Transactions and Sanctions Regulations ("ITSR")."   See 77 Fed. Reg. 64664 (Oct. 22, 2012).

from the United States to Iran any goods or technology, absent (i) limited exemptions (such as humanitarian materials) or (ii) a general or specific license not applicable to the charged conduct, without having first obtained written authorization from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia.

11.     Specifically, absent authorization from OFAC, the ITSR prohibited, among other things:

  a.  The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, trans-shipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

  b.  The reexportation from a third country, directly or indirectly, by a person other than a U.S. person, of any goods, technology, or services that have been exported from the United States, if:  (a) such reexportation is undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran, and (b) the exportation of such goods, technology, or services, was subject to export license application requirements under any U.S. regulation (31 C.F.R. § 560.205);

  c.  Any transaction by any U.S. person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the

prohibitions contained in the ITSR (31 C.F.R. § 560.203); and

    d.  U.S. persons from engaging in trade-related transactions with Iran, specifically any transaction, or "dealing in or related to" goods or services of Iranian origin or goods, technology, or services for exportation, reexportation, sale or supply to Iran ("Trade-Related Transactions"). The terms "transaction" or "dealing" include purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating or guaranteeing (31 C.F.R. §560.206).

12.    As part of its enforcement efforts, OFAC also publishes a list of individuals and entities owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific, including the Global Terrorism Sanctions Regulation, 31 C.F.R. Part 594 ("GTSR"). Collectively, such individuals and entities are called "Specially Designated Nationals and Blocked Persons" or "SDNs." The property and interests in property of SDNS are blocked, and U.S. persons are generally prohibited from dealing with such SDNs and their property or interests in property. See 31 C.F.R. Part 594 (GTSR), specifically, 31 C.F.R. §§594.201 and 204. OFAC grants authorization only in the form of license.

13.    The Executive Orders and the ITSR and the GTSR were in effect at all times relevant to this Indictment.

14.    On October 12, 2011, OFAC added **Mahan** to the OFAC SDN list pursuant to Executive Order 13224 for providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"). The SDN designation limits **Mahan's** ability to engage in U.S. dollar transactions, and prohibits i) any goods, or technology from being exported, reexported, sold or supplied, directly or indirectly, from the United States to **Mahan**, or

(ii) the provisions of services by U.S. persons to **Mahan**.   See 31 C.F.R. §§594.201 and 204.

## The Export Administration Regulations

15.     The United States Department of Commerce ("DOC"), located in the District of Columbia, was responsible for reviewing and controlling the export of certain goods and technologies from the United States to foreign countries. The Export Administration Act ("EAA"), 50 U.S.C. §§ 4601-4623, authorized the DOC to prohibit or curtail the export of any goods and technology as necessary, to protect, among other things, the national security and foreign policy of the United States. The DOC, through the Bureau of Industry and Security ("BIS"), implemented that authority through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774. Although the EAA had lapsed, the EAR continued to be in effect under the provisions of IEEPA by virtue of Executive Order 13222 (August 17, 2001), as extended yearly by successive Presidential notices, the most recent being on August 15, 2017.   See 82 Fed Reg. 39,005 (August 16, 2017).

16.     Through the EAR, BIS reviewed and controlled the export from the United States to foreign countries of certain dual-use U.S. items.   15 C.F.R. §§ 734.2-.3.   In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.   Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.

17.     A Temporary Denial Order ("TDO") is an administrative order issued under the authorities of the EAR and signed by the Assistant Secretary of Commerce for Export Enforcement when presented with evidence demonstrating the need to "temporarily deny export privileges when such an order is necessary in the public interest to prevent the occurrence of an imminent violation."

15 C.F.R. § 764.6(c)   Any named parties to the TDO, which further encompassed any related parties, agents, representatives or those acting for or on their behalf, were broadly prohibited from directly or indirectly participating "in any way" in a transaction involving U.S.-origin commodities or those subject to the EAR.

18.     On March 17, 2008, the DOC, signed a TDO denying **Mahan** export privileges. The TDO broadly prohibited **Mahan** and/or other persons or companies acting for or on **Mahan's** behalf, directly or indirectly, from participating in any export transaction. This TDO has been successively renewed, the latest renewal of which occurred on June 12, 2019.

19.     The BIS also maintains a list of certain foreign persons, businesses and entities who are subject to specific and additional license requirements known as the Entity List, which is maintained at Supplement No. 4 to Part 774 of the EAR.   The purpose of the Entity List is to inform the public of entities who: have engaged in activities that could result in an increased risk of the diversion of exported, reexported, and transferred (in-country) items to weapons of mass destruction programs; been involved in activities sanctioned by the United States; or acted contrary to U.S. national security and foreign policy interests.   The EAR requires persons dealing with persons or businesses on the Entity List to seek an additional license from the BIS to export items subject to the EAR.

20.     On December 12, 2013, the BIS added **Mustafa Oveici** to the Entity List because he had engaged in the development and operation of a procurement scheme which directly supported the operation of Iranian airline **Mahan**.

21.     The EAR made it unlawful to attempt conduct prohibited by, or contrary to, or refrain from engaging in any conduct required by, the EAR.   It is also unlawful to violate any order, license or authorization issued thereunder; to cause, aid, abet, solicit, attempt, or conspire to commit a violation of the EAR, or any order, license, or authorization issued thereunder.   The EAR prohibited the ordering, buying, removing, concealing, storing, use, sale, loan, disposition,

transfer, transport, financing, forwarding, or other servicing, in whole or in part, of any item exported or to be exported from the United States, that is subject to the EAR, with knowledge that a violation of the EAR, or any order, license, or authorization issued thereunder, had occurred. *See* 15 C.F.R. § 764.2(a)-(e).

Export and Shipping Records

22.     Pursuant to U.S. law and regulation, exporters, shippers, and/or freight forwarders were required to file certain forms and declarations concerning the exports of goods and technology from the United States.   Typically, those filings were filed electronically through the Automated Export System ("AES") administered by the United States Department of Homeland Security ("DHS"), Customs and Border Protection, which was headquartered in the District of Columbia.   An Electronic Export Information form ("EEI"), formerly known as a Shipper's Export Declaration ("SED"), was an official document submitted to DHS in connection with export shipments from the United States.

23.     An essential and material part of the EEI and AES, as well as other export filings, was information concerning the end-user or ultimate destination of the export.   The identity of the end-user may determine whether the goods may be exported: (a) without any specific authorization from the U.S. Government; (b) with the specific authorization or validated license from the DOC, the United States Department of State ("DOS"), or the United States Department of the Treasury; or (c) whether the goods may not be exported from the United States.

24.     The EEI or AES is equivalent to a statement to the U.S. government that the transaction occurred as described.   The EEI and AES are used by the United States Census Bureau to collect trade statistics and by DOS and OFAC for export control purposes.   Other U.S. government agencies located in the District of Columbia also rely upon the information provided

by SED and AES records.

25.     It was also unlawful to file "false or misleading information through the . . . SED or the . . . AES," 13 U.S.C. § 305, or to use any "export control document" containing a false statement, or to misrepresent or omit a material fact for the purpose of exporting any defense article for which a license or approval is required.   22 C.F.R. § 127.2(a).   An "export control document" includes invoices, declarations of destinations, SEDs, bills of lading, and air waybills.   *Id.*

**THE CONSPIRACY**

26.     Between March 2011 and July 2018, in the District of Columbia and elsewhere, defendants **KUNTJORO, PTMS, PTAK and PTKEU,** did knowingly and willfully combine, conspire, confederate, and agree with numerous persons known and unknown to the Grand Jury, including, Conspirator A, Conspirator B, **Mustafa Oveici, and Mahan,** to commit offenses against the United States, and to defraud the United States, more particularly:

A.     commit an offense against the United States, that is, to export and cause the export of U.S.-origin aircraft parts to Iran and to engage in the Trade-Related Transactions with Iranian goods and services, to wit transporting aircraft parts to the United States for repair in the United States and reexport to Iran: (1) in violation of the embargo imposed upon that country by the United States, without having first obtained the required licenses from OFAC and the BIS, both of which are located in the District of Columbia; (2) by dealing with **Mahan,** an SDN as of October 12, 2011, without a required license; and (3) by dealing with **Mustafa Oveici,** a person on the Entity List as of December 12, 2013, and a company subject to the Entity List, without a required license, in violation of Title 50, United States Code, Sections 1701-1707; Title 15 Code of Federal Regulations Parts 730-774; Title 31, Code of Federal Regulations, Sections 560.204, 205, and 206; and Sections 594.201 and 204, and Executive Orders 12957, 12959 13059, and 13222; and

B.      defraud the United States, including the BIS and OFAC, by, without a license:, (1) interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting Trade-Related Transactions for Iranian goods and services, and the export or supply of goods from the United States to Iran; (2) interfering and obstructing the enforcement of restrictions on **Mahan**, which was an SDN and an entity with a TDO; and (3) interfering and obstructing the enforcement of restrictions against **Mustafa Oveici**, who is on the Entity List, without a license, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

27.     The conduct alleged in this Indictment occurred within the District of Columbia and elsewhere, and therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Section 3237(a).   Additionally, the conduct alleged in this Indictment began outside the jurisdiction of any particular state or district of the United States, but within the jurisdiction of the United States and therefore, pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia.

### Objects of the Conspiracy

28.     The objects of the conspiracy were to acquire U.S.-origin goods from the United States in violation of U.S. sanctions against Iran; to supply those to **Mahan**, an SDN that was subject to a TDO on October 12, 2011, in Iran; to reexport U.S.-origin goods at the direction of **Mustafa Oveici**, a person who was on the Entity List as of December 12, 2013; to conceal from U.S. companies and the U.S. government that the U.S.-origin goods were destined for **Mahan**, **Mustafa Oveici**, and Iranian end-users so as to avoid penalties and disruption of the illegal activity; to make a financial profit for the conspirators; to frustrate the laws and regulations of the

United States, including those of the BIS and OFAC; and to evade the prohibitions and licensing requirements of IEEPA, GTSR, ITSR and EAR.

**Manner and Means of the Conspiracy**

29.    The manner and means by which the conspirators sought to accomplish the objects of the conspiracy included the following:

a.    The conspirators began planning and acting outside of the United States to acquire U.S.-origin goods from inside the United States and elsewhere.

b.    The conspirators used e-mail accounts and other forms of electronic communication to communicate with one another and with other individuals located in the United States, Singapore, Indonesia, Iran, and elsewhere.

c.    The conspirators used companies outside of Iran to solicit purchase orders for U.S.-origin goods from companies located in the United States on behalf of other conspirators inside Iran and elsewhere.

d.    The conspirators engaged in Trade-Related Transactions with **Mahan** and others to transport goods owned by **Mahan**, to the United States for repair and reexport to **Mahan** in Iran and elsewhere, including brokering, purchasing, selling, transporting, swapping, financing, facilitating and guaranteeing of such transactions.

e.    The conspirators used companies outside of Iran, including defendants **PTMS**, **PTAK** and **PTKEU**, to coordinate and transship U.S.-origin goods from the United States through third countries, including Thailand, Hong Kong, and Singapore, to **Mahan** in Iran.

f.    The conspirators intentionally concealed from companies, shippers, and freight

forwarders located in the United States the ultimate end-use and end-users of the U.S.-origin goods.

g.  The conspirators caused and attempted to cause U.S.-origin goods to be exported and reexported from the United States to individuals and entities in Iran without obtaining valid licenses from OFAC and BIS, which are located in the District of Columbia.

h.  The conspirators caused international monetary instruments to be sent to and from Indonesia, Singapore, United States, and elsewhere, to pay for U.S.-origin goods.

**Overt Acts**

30.    In furtherance of the above-described conspiracy, and in order to carry out the objects thereof, Defendants **KUNTJORO , PTMS, PTAK, and PTKEU** and other conspirators, including Conspirator A, Conspirator B, **Mahan**, and **Mustafa Oveici**, committed or caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

a.  In or about August 2012, Conspirator B, located in the United States, exported a linear actuator, an airplane part with part number 1830T100-5 and serial number 1119, from the United States to **PTMS** and **KUNTJORO** through a freight forwarding company located in Singapore, for the purpose of re-exporting to **Mahan**.

b.  On or about October 4, 2012, **PTMS** paid Conspirator B over $131,000 via a wire transfer from Indonesia to the United States for multiple aircraft parts which were shipped to **Mahan**, including a linear actuator with part number 1830T100-5 and serial number 1119.

c.  In or about October 2012, Conspirator B, **KUNTJORO**, **Mustafa Oveici** and

others met in Bangkok, Thailand to discuss business arrangements and payment for aircraft parts reexported by Conspirator A by and through Conspirator B, from the United States to **PTMS** and to **Mahan**.

d. On or about June 3, 2013, **KUNTJORO** emailed Conspirator A to have a U.S.-based company repair a **Mahan** altimeter with part number 64111-992-1 and serial number 592.

e. On or about October 21, 2013, Conspirator B re-exported a repaired **Mahan** altimeter with part number 64111-992-1 and serial number 592, from the United States to **PTMS** and **KUNTJORO** through a freight forwarding company in Singapore, for the purpose of re-export to **Mahan**.

f. On or about August 22, 2014, **PTMS** paid Conspirator B over $36,000 via a wire transfer from Indonesia to the United States for multiple aircraft parts which were shipped to **Mahan**, including an altimeter with part number 64111-992-1 and serial number 592.

g. Between March 2011 and April 2015, **PTMS** caused the shipment of dozens of used and damaged **Mahan** airplane parts through Bangkok and Singapore to Conspirator B for repair and refurbishment in the United States, and submitted purchase and repair orders to **Mahan** in an amount in excess of $3,000,000.

h. Between January 2012 and April 2015, **PTMS**, **PTKEU** and Person C wired Conspirator B hundreds of thousands of dollars in the United States to repair **Mahan** airplane parts in the United States and to re-export those airplane parts back to **PTMS** and **Mahan**.

i. Between January 2012 and January 2018, Conspirator A and Conspirator B kept,

maintained, stored and warehoused the used, damaged and subsequently repaired airplane parts shipped by **Mahan** through **KUNTJORO** in the United States, for the purpose of ultimately returning these parts to **Mahan** through **KUNTJORO** upon full payment for repair work completed and other services rendered.

j.  Between January 2012 and April 2015, Conspirator B shipped dozens of repaired and refurbished **Mahan** airplane parts from the United States to **PTMS** and **Mahan** by shipment through freight forwarding companies in Singapore and elsewhere.

k.  In or about May 2013, **Mahan** communicated with **KUNTJORO** and suggested that they conduct their business using a front company other than **PTMS**.

l.  In or about May 2013, **KUNTJORO** utilized a new company, **PTKEU**, which he explained to **Mahan** would be used to respond to **Mahan's** request for quotations for tools and equipment.  On or about May 23, 2013, **KUNTJORO** emailed **Mahan**, "everytime you send the rfq [request for quotation] for tools and equipment ONLLY[sp.], you will get quotation from [**PTKEU**].  And al[]ways copy to my email address."

m.  On or about February 17, 2015, **PTKEU** paid Conspirator B over $160,000 via wire transfer from Indonesia to the United States for multiple parts which were shipped to **Mahan**.

n.  In or about February 2017, **PTAK** and **KUNTJORO** negotiated with **Mahan** to have **PTAK** purchase, repair and refurbish **Mahan** airplane parts from Iran.  The parties agreed that **Mahan** would ship its airplane parts to **PTAK** through a freight forwarder, COMPANY A, located in Singapore.  **PTAK** and **KUNTJORO** also agreed that COMPANY A would then ship the **Mahan** airplane parts to a different

freight forwarding company ("COMPANY B") located in Hong Kong for repackaging to repair facilities outside of Hong Kong without **Mahan** packaging to the repair/refurbishment destination.

o. In or about August 2017, **KUNTJORO** and **PTMS** communicated with Conspirator A to obtain certain airplane parts that Conspirator B had repaired for **Mahan** and **PTMS** between 2012 and 2105, but that PTMS had not provided full payment to Conspirator B.   These items were stored by Conspirator B in the United States until full payment was to be provided by **PTMS** for work performed by Conspirator B for **PTMS** and **Mahan**.

p. From in or about September 2017 through November 2017, **KUNTJORO** communicated electronically with Conspirator A and Conspirator B multiple times. During these communications, **KUNTJORO** promised that he would fully repay Conspirator B if it would re-export the sequestered **Mahan** airplane parts to **PTMS** and **Mahan**, and issue a new invoice for **PTMS**.   **KUNTJORO** further promised future **Mahan** business would flow to Conspirator B if the prior parts were shipped to **PTMS**.

q. On or about November 27, 2017, **KUNTJORO** caused **PTMS** to send $100,000 from an Indonesian Bank into Conspirator B's HSBC account in the United States. The wire transfer contained a remark/message which stated, "Partial Payment."

r. On or about December 13, 2017, **KUNTJORO** caused **PTMS** to send an additional $100,000 from an Indonesian Bank to Conspirator B's HSBC account in the United States.

s. On or about January 28, 2018, **PTMS** submitted to Conspirator B a completed BIS

form BIS-711, for the **Mahan** airplane parts that had been sequestered by Conspirator B, to be submitted to the DOC.   The BIS-711 is a "Statement by the Ultimate Consignee and Purchaser."   The BIS-711 is to be filled out by the ultimate consignee, defined as the person, party or designee that is located abroad and actually receives the export shipment.   The end-user of the exported items is to be declared and the form signed by the ultimate consignee and the purchaser attesting to the accuracy and truthfulness of the information entered on the form and has the following statement: "We acknowledge that the making of any false statements or concealment of any material fact in connection with this statement may result in imprisonment or fine, or both and denial, in whole or in part, of participation in U.S. exports and reexports."   **PTMS** submitted a BIS-711 that falsely claimed the parts were solely for Indonesian airplane companies and suppliers. The form was signed by **KUNTJORO** for **PTMS**, attesting to its truthfulness.

t.   On or about February 28, 2018, **KUNTJORO** sent an email to a BIS Special Agent, who was in in the District of Columbia, that stated he had completed the BIS-711 form for the detained parts, and that the parts were for the identified end user companies in the form (but did not name **Mahan**).

**(Conspiracy to Unlawfully Export United States Goods and Technology to Iran and to Defraud the United States**, Title 50, United States Code, Section 1705, Title 15, Code of Federal Regulations, Parts 730-774, Title 31, Code of Federal Regulations, Parts 560 and 594 all in violation of Title 18, United States Code, Section 371)

## COUNT TWO THROUGH SIX - ATTEMPTED UNLAWFUL EXPORTS TO IRAN

31.   The allegations in Paragraphs 1 through 25 of this Indictment are incorporated and

re-alleged by reference herein.

32.     Between in or about January 2013 and April 2015, **KUNTJORO** and **PTMS** shipped used and damaged **Mahan** airplane parts that had been shipped to **PTMS** through Singapore and elsewhere, to Conspirator B in the United States for Conspirator B to repair the parts and send them back to **PTMS** for ultimate shipment to and for **Mahan**.   These items included, but was not limited to, the following items:

   a.  An Acutator with part number 5830201-111 and serial number 2509;

   b.  A valve with part number 88005B0306 and serial number 245;

   c.  A computer with part number 4052510-978 and serial number 91085556;

   d.  A traffic collision avoidance system processor/indicator with part number 751900-10003 and serial number 97120230; and

   e.  A Yaw rate gyro/horizon indicator with part number 401RGU-FA2 and serial number AE545.

33.     At the request of **PTMS** and **Mahan**, Conspirator B repaired airplane parts that **PTMS** had shipped to it, including the parts listed in paragraph 32 a through e.

34.     Between in or about August 2017 and January 2018, **KUNTJORO** and **PTMS** communicated with Conspirator B to attempt to re-export the airplane parts that Conspirator B had repaired in the United States at the request of **PTMS** and **Mahan**.   The parts included those listed in above paragraph 32 a through e.

35.     Between November 2017 and February 2018, **KUNTJORO** and **PTMS** caused false information to be filed with the BIS in an attempt to fraudulently obtain the goods without an export license.

36.     On or about November 27, 2017, and December 13, 2017, **KUNTJORO** caused

**PTMS** to send a total of $200,000 from an Indonesian Bank into Conspirator B's HSBC account in the United States as payment to Conspirator B for the repaired **Mahan** airplane parts.

37.     Between in or about January 2013 and February 2018, **PTMS** and **KUNTJORO** attempted to reexport and engage in Trade-Related Transactions for the airplane parts listed in paragraph 32 a through e from the United States to Indonesia for **Mahan** in violation of IEEPA, ITSR, and the GTSR.

| COUNT | ITEM |
|-------|------|
| 2 | An Actuator with part number 5830201-111 and serial number 2509 |
| 3 | A valve with part number 88005B0306 and serial number 245 |
| 4 | A computer with part number 4052510-978 and serial number 91085556 |
| 5 | A traffic collision avoidance system processor/indicator with part number 751900-10003 and serial number 97120230 |
| 6 | A Yaw rate gyro/horizon indicator with part number 401RGU-FA2 and serial number AE545 |

**(Unlawful Export and Attempted Export to Embargoed Country, and Global Terrorism Sanctions Regulations**, in violation of Title 50, United States Code, Section 1705, Title 15, Code of Federal Regulations, Parts 730-774, Title 31, Code of Federal Regulations, Parts 560 and 594; **Aiding and Abetting and Causing an Act to Be Done**, in violation of Title 18, United States Code, Section 2))

## COUNT SEVEN – CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS

38.     The allegations in Paragraphs 1 through 25 of this Indictment are incorporated and re-alleged by reference herein.

39.     Between in or around October 2011, through in or around December 2017, defendants **KUNTJORO**, **PTMS**, and **PTKEU**, and persons known and unknown to the Grand Jury, including Conspirator A, Conspirator B, **Mahan** and **Mustafa Oveici**, willfully combined, conspired, confederated, and agreed with each other, within the District of Columbia and

elsewhere, to violate Title 18, United States Code, Section 1956(a)(2)(A), by transporting, transmitting, and transferring, or attempting to transport, transmit, and transfer monetary instruments and funds from places outside of the United States, that is Indonesia and elsewhere, to and through a place inside the United States, with the intent to promote the carrying on of a specified unlawful activity; that is, violations of the IEEPA, ITSR, GTSR, and other U.S. export control laws.

(**Conspiracy to Launder Monetary Instruments**, in violation of Title 18, United States Code, Sections 1956 (a)(2) and 1956(h))

### COUNT EIGHT – FALSE STATEMENTS

40.      The allegations in Paragraphs 1 through 25 of this Indictment are incorporated and re-alleged by reference herein.

41.      On or about January 28, 2018, **PTMS** submitted to Conspirator B a completed a BIS form, BIS-711, for certain **Mahan** airplane parts that it had requested Conspirator B to export. The BIS-711 is an official DOC form.   The BIS-711 form submitted by **PTMS** for submission to the BIS falsely claimed the parts were solely for Indonesian airplane companies and suppliers and it contained attachments which purported to be official documents from the Republic of Indonesia, Ministry of Transportation, Directorate General of Civil Aviation and two other documents. The form was signed by **KUNTJORO** attesting to its truthfulness.

42.      On or about February 28, 2018, **KUNTJORO** sent an email to a Department of Commerce Special Agent in the District of Columbia that stated **KUNTJORO** had completed the BIS-711 form for the sequestered parts by Conspirator B, and that the information contained in the form that claimed the parts were for various companies – and which did not name **Mahan** -- was truthful and accurate.

43.      Between in or about January 2018 and August 2018, defendants **KUNTJORO** and

**PTMS** did willfully and knowingly make and use, and cause to be made and used, false writings and documents, knowing the same to contain a materially false, fictitious, and fraudulent statement and entry in a matter within the jurisdiction of the DOC, which is located in the District of Columbia, when defendants **KUNTJORO** and **PTMS** there and then knew that these statements were false.

(**False Statements**, in violation of Title 18, United States Code, Section 1001(a)(2), and **Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2**)

## Forfeiture Allegation

1.     Upon conviction of any of the offenses alleged in Counts One through Six, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.  The property subject to forfeiture includes the following:

  a. $200,000 in U.S. currency that was seized by the United States, with legal process issued from the United States District Court for the District of Columbia, from HSBC Bank USA Account *****5815 in the true name of Conspirator B;

  b. $150,000 in U.S. currency that was seized by the United States, with legal process issued from the United States District Court for the District of Columbia, from Bank of New York-Mellon Holding Account ****8400, that was wired from CIMB-Niaga Bank Account ***********1004 in

Indonesia, in the name of PTMS, to Bank of America Account

********5665, in the United States, in the name of Company C, in the State

of Texas;

c.  Air Cycle Machine, PN: 204975, SN: 124-2421;

d.  ACM, PN: 1344D000-002; SN: A831862-1;

e.  ACM, PN: 1344D00002, SN: 794900-4;

f.  ACM, PN: 88005B0306; SN: 245;

g.  MEC, PN: 8061-868, SN: WYG47208;

h.  Indicator, PN: V2AMO, SN: 249;

i.  Actuator, PN: 5830201-111, SN: 2509;

j.  Computer, PN: 4052510-978, SN: 91085556;

k.  Computer, PN: ED44C209, SN: 587;

l.  Computer, PN: 35-400-1044, SN: 330;

m.  Indicator, PN: 7517900-10003, SN: 97120230;

n.  Indicator, PN: 60-75503, SN: 03700825T; and

o.  Horizon Indicator, PN: 401RGU-FA2, SN: AE545.

2.      Upon conviction of the offense alleged in Count Seven, the defendants shall forfeit

to the United States any property, real or personal, involved in this offense or any property

traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).   The

United States will also seek the forfeiture of the following specific property: (a) $200,000 in U.S.

currency that was seized by the United States, with legal process issued from the United States

District Court for the District of Columbia, from HSBC Bank USA Account *****5815 in the

true name of Conspirator B and (b) $150,000 in U.S. currency that was seized by the United

States, with legal process issued from the United States District Court for the District of Columbia, from Bank of New York-Mellon Holding Account ****8400, that was wired from CIMB-Niaga Bank Account ************1004 in Indonesia, in the name of PTMS, to Bank of America Account ********5665, in the United States, in the name of Company C, in the State of Texas. The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, involved in this offense, or any property traceable to such property.

3.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the

value of the property described above, pursuant to 21 U.S.C. § 853(p).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 18, United States Code, Section 982(a)(1); Title 21,United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c))

A TRUE BILL


FOREPERSON


*Jessie K. Liu /dc*

Attorney of the United States in
And for the District of Columbia